NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2315-20

TOWNSHIP OF MONTCLAIR
COMMITTEE OF PETITIONERS
and MONTCLAIR PROPERTY
OWNERS ASSOCIATION,

    Plaintiffs-Respondents,

v.

TOWNSHIP OF MONTCLAIR,
MAYOR AND COUNCIL OF THE
TOWNSHIP OF MONTCLAIR,
THE CLERK OF THE TOWNSHIP
OF MONTCLAIR, and STATE OF
NEW JERSEY,

    Defendants-Appellants.

_____

APPROVED FOR PUBLICATION

November 30, 2021

APPELLATE DIVISION

> Argued September 21, 2021 – Decided November 30, 2021
>
> Before Judges Fisher, Currier and DeAlmeida.
>
> On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2724-20.
>
> Ira Karasick argued the cause for appellants.
>
> Charles X. Gormally argued the cause for respondents (Brach Eichler LLC, attorneys; Charles X. Gormally and Paul M. Bishop, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal, we consider a municipal clerk's determination that plaintiffs' petition for a referendum on a rent-regulation ordinance lacked sufficient signatures; the clerk's decision resulted from her discerning of differences between some of the petition's e-signatures and the corresponding voters' pen-and-ink signatures on the voter rolls. We affirm the trial judge's determination that the clerk acted arbitrarily and capriciously. Among other things, we conclude it was unreasonable, because of the limiting circumstance of the COVID-19 pandemic, and the Governor's emergency order precluding door-to-door solicitations, for the clerk not to reach out and provide voters with an opportunity to cure the alleged uncertain signatures before attempting to disenfranchise them from the referendum process.

On April 7, 2020 – mere weeks after the COVID-19 pandemic fully hit our shores – the Township of Montclair enacted an ordinance adopting rent regulation provisions. Desirous of challenging the ordinance in the following election, plaintiffs sought and obtained a trial court order tolling the ordinance's effective date until the lifting of the state of emergency caused by the pandemic, which impacted plaintiffs' ability to petition for signatures in favor of a

referendum to repeal the ordinance. Adhering to the Governor's Executive Order 132, which banned door-to-door signature gathering, plaintiffs created a website. The website provided visitors with the opportunity to read the ordinance and the petition before navigating to the signature page, which required that the voter: fill information fields consistent with the requirements of N.J.S.A. 40:69A-186; electronically sign; and affirm their desire to have their signature counted.

N.J.S.A. 40:69A-184 requires the signatures of fifteen percent of the registered voter population to effectuate a petition for referendum. Based on Montclair's total registered voter population, plaintiffs needed 1,020 registered-voter signatures. Plaintiffs collected 1,528 electronic signatures, and electronically filed their petition with the township clerk on September 24, 2020.

Three weeks later, the township clerk served plaintiffs with a "notice of insufficiency," revealing that she had rejected 614 signatures. 446 were rejected for reasons not contested here. Another 168 signatures were rejected because – in the clerk's view – the voter's e-signature did not match the signatures on record with the State of New Jersey Registration Voter System (hereafter "the voter system"). Based on the clerk's personal assessment, the petition was short 106 valid signatures.

Because of the pandemic's continuing impact, the trial judge allowed plaintiffs additional time to cure the alleged defects cited by the clerk. On December 7, 2020, plaintiffs filed an amended petition, which included an additional 136 e-signatures, some of which were intended to cure earlier rejected signatures. A week later, the clerk rejected many of the 136 new signatures, finding their e-signatures did not match the pen-and-ink signatures in the voter system. Ultimately, after examining both the petition and amended petition, the clerk decided there were only 1,002 signatures in support, eighteen less than the amount required to place the issue on the ballot.

A few weeks later, plaintiffs amended their verified complaint to assert the arbitrariness of the clerk's decision about the additional signatures. The trial judge entered an order that, among other things, permitted additional briefing and scheduled a return date of the original order to show cause. On January 15, 2021, the judge rendered an oral decision, concluding the clerk's actions were neither arbitrary nor capricious.

Plaintiffs timely moved for reconsideration. Plaintiffs argued the clerk's position was arbitrary and capricious if for no other reason than twenty voters signed both the petition and amended petition and had their e-signatures rejected both times. Plaintiffs also provided the trial judge with three certifications of

4

voters, as well as other information from other voters, protesting the rejection of their signatures and confirming their intent to support the referendum petition. In moving for reconsideration, plaintiffs also demonstrated that despite the clerk's possession of contact information for all these rejected voters, she failed to reach out to confirm whether or not they intended to sign the petition.

On March 16, 2021, the judge ruled in plaintiffs' favor, vacated his former decision, and concluded that the clerk's rejection of 168 e-signatures in the initial petition and the additional twenty-seven e-signatures in the amended petition – because, in the clerk's view, they did not match the pen-and-ink signatures in the voter system – was arbitrary and capricious. For the reasons given, the judge declared that the petition and its amendment satisfied the applicable statutory requirements; he ordered the clerk to certify the amended petition and direct the town council to consider it pursuant to N.J.S.A. 40:69A-191. The judge's order also declared that if the town council failed to repeal the ordinance, then the clerk was required to submit the question to the voters and the town council was to provide for a special election. We granted the town's motion for leave to appeal, and stayed the March 16, 2021 order pending our disposition of this appeal.

A-2315-20

In appealing, defendants argue that: the clerk "followed the law and exercised her discretion reasonably in all respects"; the judge "erroneously interpreted and incorrectly applied governing law"; and "the only factual findings in the record confirm the clerk's determination that [rejected] signatures . . . did not resemble the signatures" in the voter system. We disagree.

The situation was governed by N.J.S.A. 40:69A-187, which requires that the clerk "determine . . . whether the petition is signed by a sufficient number of qualified voters." As we held long ago, "[t]here is no statutory directive as to the method or means to be utilized by the clerk in order to arrive" at such a determination, but we recognized a clerk has "the discretionary power to adopt any rational means of performing [this] duty, subject to judicial review to determine whether [the clerk] . . . abused [this] discretion and acted in an arbitrary manner." D'Ascensio v. Benjamin, 142 N.J. Super. 52, 55 (App. Div. 1976).

In this case, the clerk believed her discretion permitted a signature comparison and allowed her to disregard e-signatures that did not, in her view, compare favorably to pen-and-ink signatures in the voter system. This approach was inconsistent with Stone v. Wyckoff, 102 N.J. Super. 26, 34 (App. Div. 1968), where we held that N.J.S.A. 40:69A-169 "merely requires that the signers

6

be 'qualified voters,' . . . not that their signature be in the form identical with that appearing on the registration records." We admonished municipal clerks to consider and act with the understanding that "[m]any people have more than one 'signature'" and many have signatures "which to others are illegible." Ibid. While we recognized that a clerk may at times "have some difficulty in identifying some voters where the form of signature on the petition varies from that in the registration book," thereby allowing the clerk some "administrative" discretion to "require some proof of identity or reject the name," we emphasized that absent a "significant variance" between the signature in question and the signature in the voter registry, "the presumption of genuineness of the signatures as those of qualified voters" will not be overcome. Id. at 34-35. Even though written in a less complicated pen-and-ink world, Judge Conford's Stone opinion presents principles still utile in a society well advanced into an electronic age.

Indeed, despite the problems caused by the prohibition on plaintiffs' ability to seek pen-and-ink signatures, and the obvious fact that an e-signature will likely differ in some or many respects from an inked signature, there is nothing in the record to explain how the clerk considered these limitations,[1]

---

[1] In her certification, the clerk stated that she "recognized that signing on a screen with a mouse or finger might look somewhat different than the signature

provided the signer with the presumption of validity, or applied the "significant variance" approach announced in Stone more than fifty years ago.

What is arbitrary is often governed by the circumstances surrounding the undertaking. If the clerk had the discretion to engage in a rigorous comparison of signatures, she was required to exercise that discretion reasonably. As Chief Justice Weintraub said in Richardson v. Caputo, 46 N.J. 3, 9 (1965), discretion "is never the plaything of office"; it instead "imports responsibility, a duty to act with reason." And, while "it is not for a court to choose one of several reasonable courses . . . if it clearly appears the course taken is not rooted in reason, the bounds of the delegated authority have been exceeded and it is the duty of the court to say so." Ibid. If we assume the statute authorized the clerk to engage in a painstaking comparison of e-signatures with pen-and-ink signatures, the circumstances alone warranted the clerk to do more than simply rely on the results of her own subjective analysis.

As to the twenty-seven e-signatures on which the focus turned, the clerk had their names, addresses, including email addresses, and other contact

---

in the book" and that she "compensated for such discrepancy in exercising [her] judgment." This is merely a conclusion. The clerk's submission to the trial court does not explain or give examples of how or why a discrepancy sufficient – in the clerk's view – to require a rejection of the e-signature was determined.

information. The clerk has certified that many hours were expended in analyzing signatures,[2] but common sense and a rational view of the clerk's statutory role more than persuades that the time spent comparing doubtful signatures would have been more effectively utilized by reaching out to those voters for confirmation before taking the grave step of disenfranchising them from the process. The question, after all, was not whether, when analyzed in a vacuum, an e-signature matched a pen-and-ink signature but whether the voter "intended" that the e-signature be an expression of intent to endorse the petition. See Matthews v. Deane, 201 N.J. Super. 583, 585 (Ch. Div. 1984) (recognizing that the law defines "the term 'signature' to be that which an individual intends to be his [or her] signature"); see also J.D. Loizeaux Lumber Co. v. Davis, 41 N.J. Super. 231, 238 (App. Div. 1956); Weber v. DeCecco, 1 N.J. Super. 353, 358 (Ch. Div. 1948). The clerk could have ascertained the voter's intent by simply reaching out to the voter for confirmation. Indeed, the clerk certified that she consulted New Jersey's "Guide to Signature Verification of Mail-In and Provisional Ballots and Cure of Discrepant or Missing Signatures" (issued on June 22, 2020) in conducting her comparison of signatures but apparently chose

---

[2] The clerk certified that she "and [her] assistants spent over 20 hours reviewing the petition forms, searching the voter databases, and rechecking any petitions that were rejected at least 3 times."

not to engage in the "cure" process described in that Guide to directly ascertain whether the voter intended to support the petition.

We, of course, appreciate the circumstances in which the clerk found herself in attempting to execute what she perceived to be her statutory obligation. The COVID-19 pandemic presented challenges for everyone. It left plaintiffs and interested voters in the difficult position of exercising electronically their important right of referendum. See Tumpson v. Farina, 218 N.J. 450, 480 (2014) (holding that "the right of referendum is about enfranchisement, about self-government, and about giving citizens the right to vote on matters of importance to their community"). Considering these difficulties, the clerk's failure to reach out to those voters whose e-signatures were, in the clerk's view, doubtful or at variance with the voter registry was arbitrary and capricious.

We note as well these same difficulties presented challenges for the parties and the trial court; for example, while plaintiffs were able to muster three certifications of voters whose signatures were rejected by the clerk, they were limited to relying on emails received from other voters in attempting to demonstrate the petition was supported by a sufficient number of voters. We deem it advisable now that there is greater physical accessibility to courts and

to the affected voters, that the trial judge schedule an evidentiary hearing and engage in such fact-finding as may be necessary to ensure certainty about the number of voters who, by e-signing, intended to support the petition. In determining the validity of any challenged signature, the judge should adhere to what we said in Stone:

> [O]nce the matter reaches a judicial tribunal, . . . a signature consistent with that of the registered voter, of one residing at the recorded address of the registrant, must be deemed prima facie that of the registered voter, and the burden is on any challenger to show the contrary.
>
> [102 N.J. Super. at 34.]

We, thus, remand for further proceedings in conformity with this opinion.

Remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11

A-2315-20